IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| Crittenden Hospital Association, Inc., | )   Case No. 3:14-bk-14948 |
| | )   Chapter 7 |
| Debtor | ) |

## AFFIDAVIT OF EUGENE K. CASHMAN III

| | |
|---|---|
| STATE OF TENNESSEE | ) |
| | ) |
| COUNTY OF SHELBY | ) |

Before me, the undersigned authority, personally appeared, EUGENE K. CASHMAN III, who first being duly sworn, deposes and states as follows:

1.      I am a resident of the State of Tennessee, and am over the age of nineteen years. I have personal knowledge of the facts set forth herein, except as to certain matters that I believe are true and correct to the best of my knowledge based upon my review of the books and records of the Debtors (as defined below), information provided to me by the Hospital's (as defined below) chief financial officer, auditors, accountants, consultants, department directors, and various financial advisors hired by the Debtors.

2.      I am an employee of Methodist Le Bonheur Healthcare ("Methodist"). Pursuant to an Affiliation and Consulting/Administrative Support Services Agreement between Methodist and Crittenden Hospital Association, Inc., Methodist leased my services as Chief Executive Officer ("CEO") to Crittenden Hospital Association, Inc. ("CHA"), a debtor in this court (the "Bankruptcy Court").

3.      CHA owns and operates Crittenden Regional Hospital (the "Hospital").

4.      CHA is an Arkansas not-for-profit corporation and is a tax exempt entity pursuant to 501(c)(3) of the Internal Revenue Code.

5.      CHA's chief place of business is at 200 West Tyler Street, West Memphis, Crittenden County, Arkansas.  However, CHA does not own the real property or buildings constituting the hospital complex (the "Hospital Complex").  Upon information and belief, the Hospital Complex is owned by Crittenden County (the "County") and is leased to CHA.

6.      CHA owns 100% of the membership interests in Crittenden Cares, Inc. ("CCI"), also a debtor in the Bankruptcy Court.

7.      CCI is an Arkansas for-profit corporation.

8.      CCI's chief place of business is at 308 South Rhodes Street, West Memphis, Crittenden County, Arkansas.

9.      I have served since October 1, 2012, as both CEO of the Hospital and CCI (individually a "Debtor," and collectively the "Debtors").  At all times as CEO I acted at the direction of the Board of Trustees of CHA (the "Board").

10.      As CEO, I have been responsible for the supervision of the operations of the Debtors, and am familiar with the general operations and financial performance of the Debtors from October 2012 until September 12, 2014 (the "Time Period").

11.      The largest secured creditor of the Debtors is the Bank of the Ozarks, in its capacity as indenture trustee (the "Indenture Trustee") for bonds that were issued in 2007 in the original principal amount of approximately $7 million (the "Bonds").  Among the collateral pledged under the trust indenture (the "Indenture") to secure the payment of the Bonds are the accounts and proceeds of any insurance policies of the Hospital.  The County is also a party to

2

the Indenture, and, upon information and belief, the County has mortgaged the Hospital Complex to the Indenture Trustee. I have been informed that under the terms of the Indenture, CHA has also pledged its leasehold interest in the Hospital Complex to secure the repayment of the Bonds.

12.     I understand that before I became CEO and throughout the Time Period, the Hospital has struggled financially. While CHA has not defaulted on its payments on the Bonds, CHA has had difficulty meeting all its obligations to creditors who extended materials or services to the Hospital.

13.     The Board and I believed, until late last month, that the Hospital's operations were viable and sustainable, subject to more financial support from the County (in the form of the Sales Tax (as defined below)) and/or a buyer or partner coming forward and through the recruitment of additional physicians.

14.     During the Time Period, the Hospital's gross revenues were approximately $167 million in 2012 and $172 million in 2013. The Hospital's gross revenues for the first seven months of 2014 are approximately $84 million.

15.     It was apparent to me and the Board that a number of factors were causing the financial difficulties. First, the Hospital's census averaged between 35-45 inpatients per day. The Hospital was built to accommodate as many as 140 patients. Second, CHA has lost significant numbers of physicians to retirement, relocation or because they took positions elsewhere.

16.     In response to the Hospital's financial challenges, the Board met on numerous occasions, including many meetings in addition to regularly scheduled Board meetings.

3

17.    As a result of its numerous meetings, the Board authorized or I undertook actions to address the Debtors' financial distress.  One of these was to focus on recruiting new physicians to the Hospital.  Between October 2012 and March 2013, CHA contracted with and brought two primary care physicians, two internal medicine physicians, and an OB/GYN to the Hospital.  The recruitment of the aforementioned new physicians did not exceed the number of physicians who were no longer affiliated with CHA.  Since, 2008, a total of thirty-seven physicians have retired, relocated or found opportunities outside of CHA.  Many of those departed physicians were key surgeons, medical consultants, and medical internists vital to the financial stability of the Hospital and its patient census. In 2012, six physicians left the Hospital. Between February 2013 and January 2014, eight physicians left the Hospital.  As a result, the Hospital's ability to increase its census and accommodate certain specialties was reduced. Further, the departure of certain selected specialties, such as general surgery, urology and ENT, the source of healthy profit margins to the Hospital, negatively influenced revenues.

18.    I undertook to reduce and eliminate some of the Hospital's costs.  This included staffing to budget, eliminating all travel, and instituting additional spending controls.  Among other things, this cost reduction effort included closing the Hospital's 2 South nursing unit, a hiring freeze for vacant positions was instituted, and all capital projects were halted.  The Hospital also closed its Urgent Care Clinic and Rural Health Clinic. In addition in November 2013 the Hospital eliminated 23 positions and permanently froze the filling of numerous vacant positions.

4

19.     Historically, the Hospital had been the beneficiary of a millage tax pursuant to which, the County receives approximately $250,000 per year that it can use to ensure upkeep of the Hospital Complex.

20.     With the millage tax in mind, early in 2014, the Board proposed having a Crittenden County sales tax imposed which would generate revenues that could go directly to the operations of the Hospital. At that time, based upon the available financial data provided by the CFO and the Hospital's auditors, it appeared that the Hospital operated with an annual deficit of (according to our 2012 audit) $4.9 million per year. As a result, during the first quarter of 2014, CHA proposed to the County Court a county sales tax which, if passed, would have generated $6 million per year (the "Sales Tax") to CHA. At the time CHA proposed the Sales Tax to the County, it appeared that it would generate sufficient annual revenue to offset the Hospital's operating deficit and allow the Hospital to fund some of its existing deficits.

21.     In June 2014, the Sales Tax passed by a vote of 86% by the citizens of Crittenden County. Revenues from the new Crittenden County Sales Tax, however, would not be collected until October 1, 2014 and the Hospital would not receive the first payment until December 23, 2014.

22.     The Board also began a process to locate a potential partner or buyer for the Hospital. In February 2014, the Board approved the retention of Raymond James as investment banker to seek either a partner or buyer for the Hospital. Raymond James marketed the hospital nationally, and there was significant interest for the Hospital. Between 15 and 20 prospective buyers responded and six signed confidentiality agreements. By July 2014, two of the

5

prospective buyers identified by Raymond James had committed to proceeding with due diligence, and an electronic data room was opened so that they could perform their due diligence.

23.    As a result of the Raymond James marketing process, the Hospital received letters of intent from two potential buyers (the identity of which is protected by the confidentiality agreement). Raymond James informed me and the Board that the highest buyer submitted a bid of $12 million. To my knowledge, the $12 million bid was submitted based upon 2013 financial data. The Board and I were informed that the $12 million bid also was subject to being adjusted for future due diligence, which included an understanding of the current financial condition of the Hospital.

24.    At the end of May 2014, the Hospital's former chief financial officer announced that he was resigning to take another job. As a result, on July 11, 2014, the Board authorized the hiring of an external accounting firm. The Board hired the accounting firm of Dixon Hughes and Goodman ("Dixon Hughes"). As part of their responsibilities Dixon Hughes was to (a) get access to data needed to forecast where and how the Hospital could move forward and if there was a significant revenue platform to move forward, (b) after reviewing the data, the Dixon Hughes team would look at options for bridge financing to help the Hospital reach the point of receiving the Sales Tax revenues, and (c) advise management of the Hospital on communications and payments to vendors. In addition, the Board authorized the hiring of outside legal counsel to assist the Hospital in considering potential partners, potential sales, or initiating a bankruptcy proceeding. As a result, the Hospital expanded the role of the law firm of Waller Lansden Dortch & Davis, LLP ("Waller") to include considering potential partners, potential sales, or initiating a bankruptcy proceeding.

25.     On June 6, 2014, a fire occurred at the Hospital. The Hospital's fire suppression system worked, and the fire department was able to contain the fire. No patients or employees were injured in the fire. Although the fire was swiftly dealt with, the smoke and water damage done to the Hospital, especially its emergency room, radiology and surgical areas required that the Hospital close for repairs. The repairs are still not complete in the 2 South Unit (where the fire originated). As a result of the damage caused by the fire, the Hospital was closed for 42 days. A second fire occurred on July 2 in the Mammography and MRI Building which caused us to lose those services and potential revenues. Those services were never brought back online.

26.     During the time the repairs were being made, because the Hospital had business interruption insurance, the Hospital continued to pay all employees. The Board was concerned about laying off additional employees during this time because we were not sure how long the Hospital would be closed and we wanted to be able to reopen with full staffing as soon as possible.

27.     Both before the fire and while the repairs were underway, the Board authorized me to seek some level of financing for the Hospital to cover ongoing costs. I, the CFO or members of the Board approached between 5 and 10 institutions to discuss possible financing options for the Hospital. Unfortunately, no lender was willing to lend to the Hospital.

28.     The Board always intended to re-open the Hospital. However, while repairs where underway, the Board considered whether it was the best decision or not. Among other reasons, the Board and I believed that there would likely be a backlog of procedures to be performed when the Hospital re-opened which would give it a boost financially, and that

7

reopening would better position the Hospital for a sale. Thus, the decision was made on July 18, 2014, to re-open and pursue a sale or locate financing.

29.     During the time the Hospital was closed, Dixon Hughes began to get an understanding of CHA's financial position. On July 23, 2014, Dixon Hughes reported to the Board that the Hospital's collections were significantly less than the CFO had reported to the Board before the fire. The information the Board and I received in May was that net revenues were averaging above $4 million per month for March, April and May. Dixon Hughes' report raised questions about the Hospital's short-term financial condition. The Board requested at the July 23 meeting that Dixon Hughes report back and provide an updated cash flow model based on post-fire collections. By early August, Dixon Hughes subsequently reported that by the end of September the Hospital would not be able to meet its payroll obligations.

30.     Following the re-opening of the Hospital, Waller and Raymond James began working with the two potential buyers to find a way to speed up the sales process. One of the two buyers almost immediately dropped out of the process upon learning of the accelerated time-line. Another continued to remain engaged in the process.

31.     During July, August and September 2014, Dixon Hughes was monitoring the Hospital's cash flow. On August 19, 2014, Dixon Hughes indicated to the Board that, notwithstanding the few days of census uptick and the receipt of business interruption insurance proceeds, the Hospital was projected to run out of cash in early/mid-September. Dixon Hughes also informed the Board that current projections showed the Hospital was generating about $2 million of revenue per month, but incurring about $5 million of expenses.

32.     Based upon Dixon Hughes' August 19 projections, the Board requested that Raymond James and Waller inform a potential bidder that the Hospital would need to cease operating unless the remaining potential bidder would fund the $3 million per month deficit.

33.     Unfortunately, the remaining bidder was not willing to fund CHA's deficits.

34.     Based upon this knowledge, on August 24, 2014, rather than incur further deficiencies, the Board voted to close the Hospital.  In addition, the Board also authorized me to prepare the Hospital for filing a bankruptcy proceeding.

35.     On August 25, 2014, I informed the Hospital's employees that the Hospital would be closing.  In connection with that announcement, the employees were told that they would receive their regular paycheck for the prior two weeks on Friday, August 29, and that they would also receive a paycheck for the period through September 5.  On August 29, 2014, the Hospital paid all employees their wages for the two weeks ended August 22, and for the period ending September 5.  In connection with the paychecks employees received on August 29, the Hospital did not withhold funds for the health plan.

36.     Upon announcing that the Hospital would close, the Hospital was contacted by several home health companies regarding the potential purchase of the home health license and home health business CCI operated in Crittenden County.

37.     The Hospital immediately initiated a process by which interested parties could bid on the assets of CCI's home health business, including one home health license owned by CCI and three home health licenses owned by CHA.  The process provided that bidders were able to re-bid to improve their bids in order to maximize proceeds to CHA.

38.     On Friday morning, August 29, 2014, the two highest offers were presented to the Board. The identity of the potential buyers was kept anonymous from the Board and me.  Based upon the information before it, the Board authorized the acceptance of the highest bid with the fewest contingencies.

39.     Before noon, but after the Board meeting, I was advised that the operations were not stable enough to sustain the home health business through the Labor Day weekend.  The Hospital contacted both bidders and informed them about the instability of the operation.  The higher of the two bidders indicated it could not be on site to stabilize the situation until Tuesday, September 2.  The lower of the two bidders said it could be on site in 45 minutes.  Thereafter, in an effort to maintain the continuity of care for current patients, and upon the advice of counsel, and to preserve the asset, the decision was made to award the bid to Home Health Partners of Arkansas-III ("HHP"), the lower of the two bidders who could be onsite in 45 minutes, for $3.15 million.  The documents were executed and HHP immediately came to West Memphis and, upon information and belief, was able to keep substantially all the employees on the job.  The Board subsequently ratified the decision to make HHP the winning bidder.

40.     Because all parties and legal counsel for all parties knew a bankruptcy filing by CHA was imminent, the sale to HHP was structured as follows: HHP and the Debtors executed all the documents, HHP immediately assumed responsibility for the operations of the business, and the $3.15 million in sales proceeds were placed in escrow with U.S. Bank, as escrow agent. The escrowed funds can only be released from escrow upon the approval or disapproval of the sale by the bankruptcy court.  Should the sale be approved by the bankruptcy court, the sales proceeds will be deposited as directed by the bankruptcy court.  Should the sale not be approved,

the sales proceeds will be returned to HHP who will then cease operating the business and return the home health business assets to the bankruptcy court.

41.    Because the CCI sale process included soliciting bids, the ability for bidders to improve their bids, and because the Board authorized acceptance of two of the highest and best bids, I believe the process (which provided for the acceptance of multiple bids and re-bidding) generated the highest and best value for the bankruptcy estates of CHA and CCI and the price paid represents the fair market value of the assets.  Further, because it was necessary for the buyer to stabilize the business immediately, it was prudent to award the bid to the buyer who was able to be onsite in 45 minutes even though its bid was lower.  HHP has no affiliation with either Debtor or the management of either Debtor.  Finally, because the Board and myself did not know the identities of the bidders, both I and our counsel believe that this was an arm's length transaction.

42.    The Hospital has maintained a health plan for employees (the "Health Plan"). Employees contributed to the Health Plan, and the Hospital traditionally funded the balance.  The Health Plan was previously managed by Simplifi and, in January 2014, Cigna became the administrator of the Health Plan and the insurer for the stop loss coverage.

43.    I have also been advised that employee contributions typically accounted for less than a quarter of the total claims annually incurred under the Health Plan.

44.    My understanding is that all contributions collected from employees have been transferred to the Health Plan administrators, either Simplifi or Cigna, however, when I became CEO the Hospital contributions to the Health Plan were not current, and have remained deficient although the Hospital has made contributions to the Health Plan throughout 2013 and 2014.  It

was anticipated that the funds raised from the passage of the Sales Tax would allow the net revenue of the Hospital to fund the Health Plan deficiciency. Throughout this process, the Hospital has been cooperating with the U.S. Department of Labor to resolve this issue.

45.     The Board and I have taken several steps to prepare for a bankruptcy filing. During the week of August 25, 2014, the Hospital attempted to negotiate with Cigna through its broker to have Cigna adjudicate outstanding employee health insurance claims. The Board is confident that if the employee health insurance claims could be adjudicated by Cigna, the amounts owed by employees could be reduced by a substantial portion as a result of the discounts Cigna has negotiated with providers.

46.     I was advised that Cigna claimed that it was owed approximately $32,000 for administrative fees and, unless those funds were paid, it would not adjudicate the claims. CHA sent the amount Cigna indicated was owing to our broker, but Cigna continued to refuse to adjudicate the claims, returned the payments, and claimed that it intended to terminate its contract with the Hospital unless the Hospital paid the outstanding stop loss premiums and funded all of the underlying claims. CHA did not have the financial resources to honor the request. As a result, by letter dated September 4, 2014, Cigna cancelled its contract with the Hospital, and refused to adjudicate any claims or apply any negotiated discounts with providers. It also cancelled its stop loss policy with the Hospital. As a result, the true amount owed on health insurance claims is still unknown.

47.     Further and in an effort to assist employees, the Debtors approached several hospitals and clinics in the region who had provided health services to employees and obtained written/verbal assurances from them that they would also no longer pursue payment from

12

Debtors' employees on account of the health services they had provided to employees or that they would apply their charity care policies to the claims against the Debtors' employees.

48.     In late August 2014, the Hospital needed to engage a restructuring firm, and on August 26, 2014, CHA engaged Kraft CPAs Turnaround and Restructuring, LLC ("Kraft").

49.     After the Hospital ceased operating, CHA has attempted to maintain its assets, and provide continued maintenance to the Hospital buildings and equipment. To that end, the Hospital has negotiated with utilities in the area to maintain electricity, gas, water and phone service at the Hospital Complex through September 30, 2014. The Hospital has property and casualty insurance through September 15, 2014, and it has hired a security service to continuously protect the Hospital Complex through September 30, 2014. The County has also generously agreed to maintain security at the Hospital Complex through the Sheriff's department. The Hospital has also paid to keep between twelve and fifteen employees on site through September 30. These employees include individuals in the IT, Finance, Account Payable, Plant Operations, Medical Records, and Billing departments. We have also asked the County to place property, casualty and earthquake insurance on the Hospital Complex for the time period after September 15, 2014.

50.     At the direction of the Board, the Hospital has also attempted to keep clinics associated with the Hospital operational. The Hospital sought offers for the clinics from local hospitals and other local clinics in an effort to enhance the value of the Hospital to a potential future operator, and provide a benefit to the community.

51.     The Hospital's fire insurance and business interruption insurance is through Chubb. I understand $1.97 million for insured claims is being held by Chubb.

13

52.     On August 25, 2014, counsel for the Hospital gave notice to the Indenture Trustee that the Hospital would be ceasing to operate. In response, the Indenture Trustee gave notice that CHA was in default of its obligations under the Indenture. It also gave notice that, since it held a perfected security interest in our accounts, proceeds of accounts and insurance proceeds, that funds received from insurance policies or from other accounts receivable should be remitted to it.

53.     On September 11, 2014, upon the advice of counsel and with the consent of the Board, $1,000,000, representing a significant amount of our cash on hand, was remitted to the Indenture Trustee, pursuant to the Indenture and the Indenture Trustee's demands. The remainder was left in accounts to pay for insurance, for professionals who assisted in preparing and filing the bankruptcy cases, to further maintain the Hospital Complex, and to leave amounts in accounts to allow the Chapter 7 trustee the ability to preserve and protect the Hospital Complex and the Debtors' assets in the days to come.

54.     The Hospital requested, and has been granted by the State of Arkansas, that the hospital license be put into a suspended status.

FURTHER AFFIANT SAITH NOT

_Eugene K. Cashman_ III
Eugene K. Cashman, III

STATE OF _Tennessee_       )
COUNTY OF _Shelby_         )

On the __22nd__ day of September 2014, before me, _Brenda K. Pannell_ the undersigned officer, personally appeared Eugene K. Cashman III, known to me (or satisfactorily proven) to be person whose name is subscribed to the within instrument and who acknowledged that he executed the same for the purposes therein contained.

In witness whereof I hereto set my hand and official seal.

_Brenda K. Pannell_
Notary Public

[Seal]

14